Natalie C. Scott, OSB #024510
nscott@scott-law-group.com
SCOTT LAW GROUP, LLP
PO Box 70422
Springfield, OR  97475
Telephone: 541-868-8005
Facsimile:  541-868-8004
Of Attorneys for Robert Sanders

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| In re:<br><br>Irwin Robert Pearlstein and<br>Chris Ramsower-Pearlstein,<br><br>             Debtors. | Case No. 17-32770-tmb7<br><br>**CREDITOR ROBERT SANDERS' OBJECTION TO TRUSTEE'S MOTION & NOTICE OF INTENT TO SETTLE & COMPROMISE (DOC. NO. 51)** |

Robert Sanders, creditor herein ("Creditor"), by and through the undersigned objects to Trustee's Motion and Notice of Intent to Settle and Compromise (**Doc. No. 51**) as follows:

### BACKGROUND

On May 30, 2019, Creditor filed a motion to re-open this case with supporting declaration and exhibits regarding his concerns with Debtors' lack of disclosure of assets and fraudulent conduct (**Doc. No. 18**).  This Court reopened the case and appointed Amy Mitchell as chapter 7 trustee ("Trustee") because the prior case trustee was no longer on the panel (**Doc. No. 21**). Creditor's counsel spoke with Trustee regarding the information Creditor had uncovered in his investigation of Debtors' assets.  Declaration of Natalie C. Scott ("Scott Dec"), ¶ 2.  Trustee agreed to further investigate.  Meanwhile, Debtor filed a response to the motion to reopen on August 6, 2019 (**Doc. No. 25**).  The court set a hearing for September 10, 2019.  In Trustee's application to employ counsel filed on August 16, 2019, Leonard Law estimated total fees of $6,000 to "assist the Trustee in investigating, and pursuing if appropriate, any non-exempt assets for the benefit of the Estate and its creditors."   *See* **Doc. No. 28**.



For the next several months, Creditor's counsel followed up with Trustee's counsel, providing an extensive memorandum regarding Creditor's investigation into Debtors' assets, sharing documents, and offering assistance in seeking or reviewing further records.  Scott Dec, ¶ 3 and **Exhibit A** (Excerpted Email exchanges August-December 2019).  Ultimately, Trustee's counsel requested Creditor "stand down" from simultaneous investigation and assured Creditor's counsel that Trustee took her duty to diligently investigate seriously.  Scott Dec, **Exhibit A**, p. 14-15.  In June 2020, Trustee's counsel indicated things "aren't looking great in terms of substantial recovery by the Estate."  Scott Dec, **Exhibit B**, p. 6.  Creditor's counsel continued to periodically inquire status and offer assistance.  Scott Dec, ¶ 4-6, **Exhibit B** (Excerpted Email exchanges May-June 2020), **Exhibit C** (Excerpted Email exchanges August-Dec 2020 (in reverse order)), and **Exhibit D** (December 2021 Excerpted Email exchange).

Nearly two years after entry of orders compelling production of documents, the court set a status hearing for January 18, 2022.  During the period of March 2020 to December 2021, Trustee did not file anything in this case although her counsel did respond to periodic status inquiries from Creditor's counsel.  No documents Trustee obtained during the investigation into Debtors were shared or disclosed to Creditor.  Before the January 2022 hearing, Creditor's counsel inquired regarding what Trustee's investigation had uncovered and Trustee's counsel indicated such information would be shared with the court at the hearing.  Scott Dec, **Exhibit D**.  A week prior to the hearing, Trustee filed a Notice of time to file claims (**Doc. No. 48**).  At the January 18, 2022 hearing, Trustee's counsel indicated he had communicated with Debtor's counsel regarding undisclosed assets and claims and was waiting to hear back regarding a demand in connection with such claims.  In response to Creditor counsel's requests for details, Trustee's counsel responded that Creditor would get details when settlement was reached and a notice was filed.  Scott Dec, ¶ 7; Summary of Proceedings (**Doc. No. 50**).  Trustee then informed



the court and Creditor that she expected there would be recovery to unsecured creditors and noted that there did not appear to be any priority tax debt. *Id*.

A few weeks later, Creditor learned that Debtor Irwin Pearlstein had passed away nearly two months before the January 18th hearing. Creditor's counsel informed Trustee. Scott Dec, ¶ 8 and **Exhibit E**. No further information or details were shared with Creditor after Creditor provided Trustee's counsel with that news.

The next activity was the Trustee's March 21, 2022 filing of the Notice and Intent to Settle (**Doc. No. 51**) ("Notice"), to which Creditor is objecting. The Notice includes roughly one page of single-spaced text, which also serves as the written settlement agreement among the parties. It bears the e-signature of Debtor Chris Ramsower-Pearlstein and sets forth payment terms and instructions. The Notice proposes settlement and global release of "various claims" against Debtors in exchange for payment from Debtor Chris Ramsower-Pearlstein of $54,000. The Notice recites investigation into undisclosed assets and income from the following five sources: Lucky Bail Bonds business ($60,000), a $25,000 country club membership, preferential car repayment of $2,398, Debtor Chris Ramsower-Pearlstein's interest in Bluestone surety (indicating receipt of "significant" residual payments; no total or value is included in the Notice), and income from Debtors having served as "straw buyers" of over a dozen life insurance policies (no total or value listed). The Notice proposes a mutual global release subject to "written representations" of Mrs. Ramsower-Pearlstein regarding assets, income, and expenses, which "representations" are not disclosed (nor offered to be disclosed by Trustee) to creditors. The Notice indicates there is nothing from deceased Debtor Irwin's probate estate, that Mrs. Pearlstein is "liquidating substantially all of her assets" to make the settlement payment, and that it "appears unlikely that the Trustee's prosecution of the Estate's claims and collection efforts would result in a net benefit" to the estate when considered against "the further attorney fees and



costs that would be required." The settlement is conditioned on accuracy of Mrs. Pearlstein's representations. No consequence for lack of accuracy nor default remedies are listed in the settlement. No carve-out or proposed recovery to unsecured creditors is set forth in the Notice.

Creditor's counsel exchanged emails with Trustee's counsel regarding details of the settlement. Through those exchanges, Creditor learned that Trustee's counsel's fees were estimated at $47,000 and thus there was likely to be little to no recovery for unsecured creditors from the settlement. Scott Dec, ¶ 9 and **Exhibit F** (Excerpted Email exchanges March 31 to April 11, 2022). Trustee's counsel indicated that Trustee projected $22,000 in recovery to Creditor but the basis for that calculation was not shared and no carve-out is listed in the Notice.

The deadline to file claims in this case was April 11, 2022. The only claims are Creditor's unsecured claim for $296,884.44 and a claim of the California franchise tax board for $25,012.28. The only other claims listed in Debtors' schedules were an IRS tax debt (which the IRS initially filed and then amended to $0), a $5,400 debt to Debtor Irwin's son David Pearlstein, a $17,000 debt to Debtors' lawyer, and a $4,400 credit card debt to Bank of America.

## DISCUSSION

It should be noted at the outset that Creditor appreciates the Trustee and Trustee's counsel's time, efforts, and professionalism in this case. However, in order to approve a proposed settlement by a Chapter 7 trustee, the court must find that the compromise is fair and equitable. The Notice does not meet that standard. This Court evaluates fairness under the following factors: (1) probability of success in litigation; (2) difficulties with collection; (3) complexity of the litigation together with the expense, inconvenience, and delay associated with it; and (4) the paramount interest of creditors and the proper deference to their reasonable views. *In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *overruled on other grounds as stated in In re Washington Public Power Supply System Sec. Litigation*, 823 F.2d 1349 (9th Cir.



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

1987); *see also In re W. Funding*, 550 B.R. 841 (BAP 9th Cir. 2016) (reviewing history and cases). The *A&C Properties* factors are not treated in a vacuum but considered as a whole. The trustee has the burden of persuading the court that the compromise is fair and equitable and should be approved. *A&C Properties*, 784 F.2d at 1382. A court abuses its discretion in approving a compromise in the absence of a record that provides adequate analysis of the merits or a sufficient factual foundation. *Id*. at 1383.

Apart from the *A&C Properties* factors (and related case law interpreting settlements per Bankruptcy Rule 9019), the trustee has obligations enumerated 11 U.S.C. § 704, including that a trustee "shall"

> "(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest[.]"

That duty is especially significant when asking creditors to approve a compromise. In the *A&C Properties* case, the record included "over 4,000" pages of information and documentation regarding the claims at issue in the compromise. 784 F.2d at 1383. The settlement agreement itself, which the bankruptcy court attached to its findings, was 25 pages and set forth "in detail" the claims it purported to settle, including the parties involved, the valuation of assets, and a cost-benefit analysis. *Id.* The Ninth Circuit observed that the compromise was not a situation "where the bankruptcy judge reached for his stamp and marked 'approved' without some party supplying concrete facts." *Id.* *See also In re WCI Cable, Inc.*, 282 B.R. 457, 472-473 (Bankr. D. Or. 2002) (approving DIP's settlement in a chapter 11 where witness testified "at length" regarding potential claims and investigation, costs of litigation would be extensive, and unsecured creditors supported the proposed settlement).

Because the interest of creditors is "paramount" and entitled to deference, the position of creditors holding the majority of claims filed deserves significant credence. *In re Lahijani*, 325 B.R. 282, 290 (BAP 9th Cir. 2005). In *Lahijani*, the BAP instructed the bankruptcy court, on



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

remand, to "consider the alternative of permitting the objecting creditors to sue in the name of

the trustee, but at their own risk and expense . . ." *Id.* at 291. It concluded that the court was

"obliged to consider" the creditor's willingness to bear the risk and expense on behalf of the

estate to litigate recovery of property that would be property of the estate and "would not

otherwise deleteriously affect the administration of the estate[.]" *Id.* at 292. The Fifth Circuit

has opined that a court cannot ignore creditors' overwhelming opposition to a settlement. *Cadle

Co. v. Mims (In re Moore)*, 608 F.3d 253, 266 (5th Cir. 2010) (citation omitted) (finding trustee

required to hold auction in no-asset case where trustee attorney fees of over $60,000 expended

and litigation represented last prospect of recovery for creditors).

Some courts have viewed efforts by creditors to buy claims against themselves with

suspicion. *See, e.g., Snow, Nuffer, Engstrom & Drake v. Tanasse*, 980 P.2d 208, 211-212 (Utah

1999) (holding law firm could not levy against client's malpractice claim against the firm). Such

heightened standard seems appropriate where debtors attempts to resolve claims against

themselves arising from their own prior fraud and nondisclosure. Here, Trustee proposes to

settle and release claims against Debtors for nondisclosure of assets by accepting cash payment

from Debtor Chris Ramsower-Pearlstein, conditioned on the accuracy of representations of assets

by the same debtor that previously failed to accurately disclose assets. Trustee has not fairly

evaluated the value of the claims or considered other options, such as assigning rights to Creditor

or permitting Creditor's review of records and substantive assistance which Creditor has offered

on many occasions in the past two years. Moreover, the proposed settlement does not guarantee

creditors any recovery at all.

Trustee's single page of single-spaced text in the Notice does not support a finding that

the proposed settlement is fair and equitable under the applicable *A&C Properties* standard. The

Notice does not indicate what litigation, if any, would be required to recover assets. It states that



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

Trustee's "prosecution" of unnamed claims "and collection efforts" are "unlikely" to result in "net benefit" to the estate.   The Notice fails to address any difficulties of collection. Considering the Trustee agreed to Debtor Chris Ramsower-Pearlstein's payment of $54,000, it does not appear collection would necessarily be difficult.  The Notice provides no details regarding the assets and income streams, listing potential value for only three of five listed items although proposing a global mutual release of all claims.  It likewise fails to set forth a factual basis demonstrating "complexity" of the claims and the "expense, inconvenience, and delay" associated with recovery for the Estate.  The statement that further investigation would result in further fees is true in every case; without more, it is not a compelling reason in support of the specifically proposed settlement in this case.

Trustee and her counsel have maintained that they cannot share records with Creditor, directing Creditor, over two years ago, to stand down and not conduct his own investigation. Trustee's counsel has incurred fees nearly 8 times the $6,000 estimated in his application to employ without providing creditors sufficient detail of that investigation.  Creditor conducted significant pre-re-opening investigation and made clear his willingness to assist the Trustee and to help shoulder the burdens of time and expense.  *See* Creditor Motion to Reopen, p. 3-4 (**Doc. No. 18**).  Trustee has cited no authority for denying Creditor access to the "thousands" of pages of documents the Notice indicates Trustee has obtained, reviewed, and analyzed.  The Notice does not address the paramount interest of creditors at all.  There is no carve-out for unsecureds, nor a projected recovery of any amount.  Not until Creditor specifically inquired did Creditor learn that there might, in fact, be no recovery at all.  Furthermore, there is no mechanism for future enforcement should the "written representations" of a previously untruthful Debtor prove false in the future.  In all likelihood, if approved, the Trustee will get the cash, distribute funds, close the estate, and that will be that.

**CREDITOR'S OBJECTION TO TRUSTEE MOTION &
NOTICE OF INTENT TO SETTLE**



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

Creditor requests the settlement, as set forth in the Notice, not be approved by this Court. Trustee has not sustained her burden to show it is fair and equitable. Creditor will seek turn-over of Trustee's records, including documents obtained on the orders for production of documents and emails and any other communications among Trustee and Debtor or other parties as part of this contested matter. Creditor will need time to review those records. Trustee should be required to consider a guaranteed carve-out or minimum distribution to unsecured creditors as well as to pursue options with Creditor regarding assignment and prosecution of some claims or rights against the Debtor or others. Only after such disclosure and efforts can the Trustee propose settlement that addresses the information required under the *A&C Properties* factors.

## CONCLUSION

The trustee should not be permitted to conduct a "secret" investigation on behalf of creditors and propose a settlement of claims with the very persons whom the claims are against – Debtors. At a minimum, approval should not be permitted until Trustee discloses records and communications and the parties are permitted further briefing and an evidentiary hearing before this Court.

DATED this 13th day of April, 2022.

SCOTT LAW GROUP, LLP

By:  /s/ Natalie C. Scott
Natalie C. Scott, OSB # 024510
Of Attorneys for Creditor Robert Sanders

PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

Natalie C. Scott, OSB #024510
nscott@scott-law-group.com
SCOTT LAW GROUP, LLP
PO Box 70422
Springfield, OR  97475
Telephone: 541-868-8005
Facsimile:  541-868-8004
Of Attorneys for Robert Sanders

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Irwin Robert Pearlstein and<br>Chris Ramsower-Pearlstein,<br><br>        Debtors. | Case No. 17-32770-tmb7<br><br>**DECLARATION OF NATALIE C. SCOTT IN SUPPORT OF CREDITOR ROBERT SANDERS' OBJECTION TO TRUSTEE'S MOTION & NOTICE OF INTENT TO SETTLE & COMPROMISE (DOC. NO. 51)** |

I, Natalie C. Scott, under penalty of perjury, make this Declaration in support of Creditor Robert Sanders' Objection to Trustee's Motion & Notice of Intent to Settle & Compromise, as follows:

1.      I am an attorney duly admitted to practice in the state of Oregon, the federal district court of Oregon and the Ninth Circuit Court of Appeals.  I am a partner in the law firm Scott Law Group LLP, which represents creditor Robert Sanders in this case.

2.      I spoke with trustee Amy Mitchell by telephone in July 2019 and later provided a memorandum to her regarding my client's investigation into assets and undisclosed income of Debtors.

3.      Attached hereto as **Exhibit A** are copies of excerpted email exchanges between me and Justin Leonard after Mr. Leonard's law firm was employed as counsel for the Trustee. The emails are from August to December 2019 and include an email dated November 5, 2019 in



which Mr. Leonard requests that my client and I "stand down" from simultaneous investigation efforts in this case.

4.    Attached hereto as **Exhibit B** are copies of excerpted email exchanges between me and Justin Leonard during the May to June 2020 time period regarding status of the investigation and requests for copies of records obtained by Trustee.

5.    Attached hereto as **Exhibit C** are copies of excerpted email exchanges between me and Justin Leonard during the August to December 2020 time period (in reverse order unlike the prior exhibits).

6.    Attached hereto as **Exhibit D** is a copy of an email exchange between me and Justin Leonard in December 2021.

7.    I attended the status hearing set by this Court on January 18, 2022 by telephone before Judge Teresa Pearson.  At that hearing, Mr. Leonard indicated his offices had communicated with Debtor's counsel, Jeff Olson (also in attendance at the hearing), regarding undisclosed assets and income, largely from undisclosed life insurance policies.  Mr. Leonard indicated further details would be shared if and when the parties settled and such settlement was noticed for court approval.  Trustee Amy Mitchell spoke at the hearing and shared helpful information and her expectation that there would be recovery for unsecured creditors.

8.    Attached hereto as **Exhibit E** is an email I sent to Justin Leonard on February 7, 2022 when my client learned that Debtor Irwin Pearlstein had passed away nearly two months before the January hearing.

9.    Attached hereto as **Exhibit F** are excerpted copies of email exchanges between me and Justin Leonard regarding the proposed settlement in the March 31, 2022 to April 11, 2022 time period.

**DECLARATION OF NATALIE C. SCOTT**          Page 2 of 3



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

**I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THAT THEY ARE MADE FOR USE AS EVIDENCE IN COURT AND ARE SUBJECT TO PENALTY FOR PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA.**

DATED this 13th day of April 2022.


/s/ Natalie C. Scott
Natalie C. Scott



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com

**Natalie Scott**

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Thursday, August 22, 2019 11:31 AM |
| **To:** | Justin D. Leonard |
| **Cc:** | Rachael Wolfgang |
| **Subject:** | In re Pearlstein, 17-32770-tmb7 follow-up |
| **Attachments:** | Ntc of Hrng 9.10.19 (080719).pdf; Dbtr Response to Mtn to Reopen (080619).pdf |

Justin,

Looks like an order on your employment was entered last week. Not sure which of you is handling this file but wanted to touch base because I'm out tomorrow and all of next week (subject to a few hours here and there and some limited email availability).

My client reviewed the debtor's filing and had some comments that I wanted to share with you. Those are below. I wasn't planning to have Mr. Sanders attend by phone for the September 10th hearing (I may be in Portland and able to attend in person but not sure yet, FYI). However, he can rearrange his schedule and do that if needed.

He also asked me to convey that he would be happy to set up a phone conference with your offices if you'd like to review this information with him directly. That can be set up for next week even if I'm out of the office and not able to participate. As you may know, Mr. Sanders is a California attorney.

Here is a modified summary of Mr. Sanders comments to me regarding Irwin Pearlstein's declaration filing:

1. If Debtor had a defense to Mr. Sanders claim for attorney's fees, he had more than adequate opportunity to defend in the trial court and never sought to set aside the judgment. Mr. Sanders takes issues with debtor's representation of the "facts" concerning the events of the representation and feels his numbers are far from accurate.

2. As for service of the notice of bankruptcy, the address of the service was wrong both as to street name <u>and</u> as to suite. As the post office does not deliver to suites but merely to mail boxes in the building at 1350 Treat Boulevard, delivery was out of the hands of the post office and instead in the hands of the unknown individual who might or might not have received the notice of bankruptcy.

3. Debtor's Declaration is the first time Mr. Sanders had heard that Irwin purchased another home after selling his Walnut Creek home. His Declaration admits his financial ties to his (unnamed) son, David, which appear to have been even greater than Mr. Sanders previously suspected. The new information further supports seeking & obtaining discovery from David Pearlstein. The Bluestone Surety business is the one that Debtor told Mr. Sanders he had capitalized with a part of Irwin's portion of the proceeds of sale of the PRSI business.

4. Discovery concerning co-debtor wife's earnings history should prove equally interesting – particularly, if she was as successful as Debtor says, we wonder why she would leave Texas for a start-up in Oregon. Tax returns of Debtor's wife should assist to answer that question.

5. The description of Debtor's relationship with son Barry again includes admissions of commingling of Debtor's assets with those of Barry Pearlstein. Debtor's statements are misleading in that it is Irwin who first owned the Lucky Bail Bonds business and who franchised it to Barry for an office in the California Central Valley. Barry could not and did not cover such a business in Indio which is far south of the Central Valley. It was Debtor who sought to invest in the Indio Bail Bond agency under the Lucky Bail Bonds license. That said, Barry was not

involved in the big money that the PRSI sale produced, so Mr. Sanders' guess is that the Lucky Bail Bonds business is something of a red herring thrown into the mix by Debtor as a distraction. It seems more prudent to focus on the relationship between Debtors and David Pearlstein, including requiring David to show exactly how Bluestone Surety was capitalized. Capitalization requirements for insurance companies are most often regulated by state agencies in which the Surety is doing business – in Bluestone's case, apparently South Carolina and North Carolina.

6.  Mr. Sanders' strong suspicion is that Debtor is telling the truth when he says that he has no (legal) interest in son David's Lafayette home; but, he may have a beneficial interest in that home on a constructive trust theory given the commingling of their finances over many years. Note: Debtor says that of his sons, he was in business with only Barry (the bail bonds business); but, it was David who, according to Debtor, consistently financed his moves. That admission merits some serious pursuit\investigating.

I hope this is helpful. If you'd like to set up a phone conference with Mr. Sanders ahead of the 9/10 hearing, please let me know possible dates/times and we can get that coordinated.

We look forward to working with you guys on this one.
Regards,
Natalie



**Natalie C. Scott** | Attorney
PO Box 70422
Springfield, OR 97475
Phone: (541) 868-8005
Fax: (541) 868-8004
**E-mail** | **Website**

**\*PLEASE CONTACT US TO SCHEDULE IN-PERSON MEETINGS OR DOCUMENT DROP-OFF OR DELIVERY REQUIRING A PHYSICAL ADDRESS.\***
*This e-mail may contain privileged and/or confidential information.*
*Do not forward, copy or print without authorization.*
*If misdirected, please delete and notify the sender by e-mail.*

**EXHIBIT A - Page 2 of 15**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, September 19, 2019 4:32 PM |
| **To:** | Natalie Scott |
| **Cc:** | Rachael Wolfgang |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |
| **Attachments:** | PEARLSTEIN - 2001 luckybailbonds.com website.pdf; PEARLSTEIN - Lucky Bail Bonds - CA License Status - Individual Details.pdf; PEARLSTEIN - Irwin Pearlstein - CA License Status - Individual Details.pdf; PEARLSTEIN - Barry Pearlstein - CA License Status - Individual Details.pdf |

Hi Natalie,

I have had a chance to dig into the documents that you and Rachael prepared, as well as do my own research. The memo to the Trustee was very helpful, as well as the information from your client in his original declaration and then his response to the Debtor's declaration, below.

I have some follow-up questions for you and your client:

## ALL CARE IN-HOME SUPPORT SERVICES LLC

Your client's Declaration states in paragraph 9 that "Debtor Irwin's son and daughter purchased the All Care business only a year prior to Debtors' bankruptcy filing. I believe that part or all of the source of funds used to make that purchase came from Debtor Irwin."

Debtor did not directly deny this, but he responded "My children do not need nor have they asked for any contribution from me." It seems to me that Debtor was not doing well financially one year prior to the filing date. How would Debtor have funded the business at that period?

(Regarding All Care In-Home's employment of Chris Sanders being fraudulent, the sworn representations denying this, and the objective facts supporting those statements, seem compelling. Based on my initial review, it seems reasonable to me that Debtors would want to help their kids -- and that their kids would want to provide employment for their parents.)

## LUCKY BAIL BONDS

Your Declaration suggested that the Lucky Bail Bonds business had value, even though it was transferred for no consideration.

Debtor's Declaration explains (under penalty of perjury): "In or about 2013, my son Barry Pearlstein asked if I would help him open a bail bond office in Indio, California. My son has been in the bail bond business for almost 40 years. Since my wife and I needed another source of income, I agreed to do that. The business entity was called Lucky Bail Bonds. That is the name my son has operated under from the time he entered the bail bond business. That name is registered with the California Department of Insurance and cannot be used as a fictitious name anywhere else in the State of California for which my son does not own the business. My son provided the bonds that I used and from the proceeds of the business; I paid my son's cost of those bonds written to the surety and the mandatory reserve contribution required by the surety. The reserve belonged to my son as well as the liability which was incurred as a result of each bond written. I also paid the overhead of the office from an operating account that was jointly owned by my son and myself. The small amount of profit realized went into my pocket. My son paid for all the alterations to the office prior to opening. What was left

was a small amount of money that we used to supplement my social security. When my wife and I moved to Texas, the day-to-day operations were taken over by my son."

You summarized your client's comments as follows: "Debtor's statements are misleading in that it is Irwin who first owned the Lucky Bail Bonds business and who franchised it to Barry for an office in the California Central Valley.  Barry could not and did not cover such a business in Indio which is far south of the Central Valley.  It was Debtor who sought to invest in the Indio Bail Bond agency under the Lucky Bail Bonds license."

I pulled information about Lucky Bail Bonds from various sources, and it seems that Barry indeed started the company. The State's licensing information for the company and for Barry are similar and go back a long way, and Irwin is merely listed as an employee of Barry and his company (beginning December 2011). Barry had a website for the company with his name on it way back in 2001 (and still does). Therefore, there is nothing about Debtor's story that seems inaccurate. What basis does your client have for contending that Irwin first owned the Lucky Bail Bonds business and franchised it to Barry, or that any other statements of the Debtor are inaccurate here?

## BLUESTONE SURETY

This business wasn't mentioned in your initial declaration, but it sounds like your client believes the Debtor also had an interest in it. Debtor's response states that he has never had an interest in Bluestone Surety, and that the company was created from the 24.5% of PRSI that David had owned. The Debtor declares under penalty of perjury that David created and sold it, and that Debtor and his wife were not shareholders and did not receive anything when it sold. Does your client have a basis to believe that these sworn statements are inaccurate?

-----

As to the Court's request that the Trustee take a position on the Motion to Reopen, I think that your client as creditor should have the right to have the case re-opened and given time for your client's own discovery. Your client provided sworn representation that he did not receive notice of the bankruptcy. It seems undisputed that the address was wrong, and that Debtor's counsel only partially corrected the error (which often result from debtor's counsel incorrectly inputting data). Even if, as Debtor contends, the incorrect suite number should be "good enough" to get the notice to your client, I don't see evidence that the Debtor's counsel ensured that the Notice of Bankruptcy was re-served on your client once the address was "corrected." I think it's likely that notice was never sent to the partially correct address. For this reason, I think your client should have an opportunity to do reasonable, targeted Rule 2004 Examinations of the Debtor regardless of what the Trustee decides to do.

Since Judge Brown wants the Trustee's perpective, I look forward to responses to my questions above. I recognize that any debtor could be lying to the trustee, and in this case, my client was not the trustee who evaluated these debtors' credibility... In this case, from my perspective so far, the debtors' stories seem consistent and plausible, and I don't see likely current assets or claims of the Estate that I think the Trustee would want to investigate and pursue. Therefore, before I talk to the Trustee about next steps, I look forward to your and your client's perspective on what I might be missing.

Thanks,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho

**Natalie Scott**

---

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Wednesday, October 02, 2019 10:22 AM |
| **To:** | Justin D. Leonard |
| **Cc:** | Rachael Wolfgang |
| **Subject:** | RE: In re Pearlstein, 17-32770-tmb7 follow-up |

Justin,

My apologies for the delay in getting back to you but I was able to follow-up with Mr. Sanders before he left town on 9/27. As you may recall he will be gone until October 23 (day after our hearing) and so won't be on the line for the hearing.

I've inserted our edited responses in <span style="color:red">red</span> to your points below. It seems minimal time/expense to the estate to subpoena records, which will easily confirm (or not) debtor's assertions, which we continue to believe to be mis-leading. I'm not sure a creditor has the same kind of reach as a Chapter 7 trustee on that but we are willing to do whatever we can to minimize legwork and assist. A targeted exam of debtors serves no purpose as we expect the same misrepresentations. What's needed are independent records - some could come from debtor, like tax returns, but we are thinking bank statements of debtors and their kids and of the All-Care and insurance business will be much more revealing.

I hope the trustee will support re-opening to issue the subpoenas. My client is not pursuing a 523 or 727 claim (even if we could argue tolling of the SOL on those). He is interested in ASSETS and getting recovery here. He's aware the California tax creditor is ahead of him in priority. Judge Brown and Pearlstein's attorney both acknowledged at the hearing that the trustee would need some time to conduct discovery. Our hope is that subpoenas can be issued this week so the trustee can report to the court on October 22nd.

I will try calling you later today and see if we can connect.
Natalie

**From:** Justin D. Leonard <jleonard@llg-llc.com>
**Sent:** Thursday, September 19, 2019 4:32 PM
**To:** Natalie Scott <nscott@scott-law-group.com>
**Cc:** Rachael Wolfgang <wolfgang@scott-law-group.com>
**Subject:** Re: In re Pearlstein, 17-32770-tmb7 follow-up

Hi Natalie,

I have had a chance to dig into the documents that you and Rachael prepared, as well as do my own research. The memo to the Trustee was very helpful, as well as the information from your client in his original declaration and then his response to the Debtor's declaration, below.

I have some follow-up questions for you and your client:

## ALL CARE IN-HOME SUPPORT SERVICES LLC

Your client's Declaration states in paragraph 9 that "Debtor Irwin's son and daughter purchased the All Care business only a year prior to Debtors' bankruptcy filing. I believe that part or all of the source of funds used to make that purchase came from Debtor Irwin."

Debtor did not directly deny this, but he responded "My children do not need nor have they asked for any contribution from me." It seems to me that Debtor was not doing well financially one year prior to the filing date. How would Debtor have funded the business at that period?

My client does not believe Pearlstein based on having personally worked with him for years.  He knows firsthand how sophisticated Pearlstein is and that he's more than capable of hiding assets and structuring transactions to avoid things and make his financial situation look dire.  He noted the following:  Debtor's statement is evasive.  A few subpoenas should quickly put an end to the notion that Alexandra Pearlstein had an funds of her own with which to make the purchase and that Irwin's and Barry's funds were so commingled as to make it impossible to say who was the real owner.  The convoluted purchase and transfers surrounding the acquisition of the Walnut Creek property should give any investigator a big head's up as to the extent of the commingling.  Debtor has long been reluctant to pay his personal obligations, including but not limited to his obligation to support Alexandra (the child support obligation) -- but that does not mean that Irwin was impecunious.  Rather, he did not pay the obligations that he did not want to pay.  As you may recall, Debtor's daughter, Alexandra, was barely out of college and had no estate of her own; and Irwin capitalized son David's insurance business to the point that David was willing to make the convoluted Walnut Creek real estate purchase for him and place that purchase in his name.  .

(Regarding All Care In-Home's employment of Chris Sanders being fraudulent, the sworn representations denying this, and the objective facts supporting those statements, seem compelling. Based on my initial review, it seems reasonable to me that Debtors would want to help their kids -- and that their kids would want to provide employment for their parents.)

The issue is the employment of Chris Ramsower-Pearlstein.  She has not submitted such a declaration.  None of the Pearlstein children referenced in this matter are the kids of the Irwin-Chris marriage.  All are kids from Irwin's prior marriages.  The inferred filial bond is not there.

## LUCKY BAIL BONDS

Your Declaration suggested that the Lucky Bail Bonds business had value, even though it was transferred for no consideration.

Debtor's Declaration explains (under penalty of perjury): "In or about 2013, my son Barry Pearlstein asked if I would help him open a bail bond office in Indio, California. My son has been in the bail bond business for almost 40 years. Since my wife and I needed another source of income, I agreed to do that. The business entity was called Lucky Bail Bonds. That is the name my son has operated under from the time he entered the bail bond business. That name is registered with the California Department of Insurance and cannot be used as a fictitious name anywhere else in the State of California for which my son does not own the business. My son provided the bonds that I used and from the proceeds of the business; I paid my son's cost of those bonds written to the surety and the mandatory reserve contribution required by the surety. The reserve belonged to my son as well as the liability which was incurred as a result of each bond written. I also paid the overhead of the office from an operating account that was jointly owned by my son and myself. The small amount of profit realized went into my pocket. My son paid for all the alterations to the office prior to opening. What was left was a small amount of money that we used to supplement my social security. When my wife and I moved to Texas, the day-to-day operations were taken over by my son."

My client notes the following:  Stop and think about Debtors' quoted statement which, stripped of the irrelevant inclusions says this:  In or about 2013, my wife and I needed a source of income other than my social security so I agreed to assist my son Barry to start a new business for which I paid my son's costs.  Seems a bit counter-intuitive to undertake the debt of a new business when you need money yourself.

You summarized your client's comments as follows: "Debtor's statements are misleading in that it is Irwin who first owned the Lucky Bail Bonds business and who franchised it to Barry for an office in the California Central Valley.  Barry could not and did not cover such a business in Indio which is far south of the Central Valley.  It was Debtor who sought to invest in the Indio Bail Bond agency under the Lucky Bail Bonds license."

I pulled information about Lucky Bail Bonds from various sources, and it seems that Barry indeed started the company. The State's licensing information for the company and for Barry are similar and go back a long way, and Irwin is merely listed as an employee of Barry and his company (beginning December 2011). Barry had a website for the company with his name on it way back in 2001 (and still does). Therefore, there is nothing about Debtor's story that seems inaccurate. What basis does your client have for contending that Irwin first owned the Lucky Bail Bonds business and franchised it to Barry, or that any other statements of the Debtor are inaccurate here?

<span style="color:red">My client notes the following:  Irwin's sworn statements in his California divorce action characterize him as owner of Lucky Bail Bonds.  If you ask Debtor to place into writing, under oath, that he never had an ownership interest in an entity known as Lucky Bail Bonds, my client doubts he'll do it because he swore under oath to the divorce court that he owned it.  These inconsistencies cast doubt on the veracity of debtor's statements.</span>

## BLUESTONE SURETY

This business wasn't mentioned in your initial declaration, but it sounds like your client believes the Debtor also had an interest in it. Debtor's response states that he has never had an interest in Bluestone Surety, and that the company was created from the 24.5% of PRSI that David had owned. The Debtor declares under penalty of perjury that David created and sold it, and that Debtor and his wife were not shareholders and did not receive anything when it sold. Does your client have a basis to believe that these sworn statements are inaccurate?

<span style="color:red">My client notes the following:  Irwin told his family law attorney that he capitalized Bluestone to assist his son David, not that he ever held title to that business entity.  Again, Irwin is being evasive.  24.5% of PRSI sale proceeds was far less than that which Debtor received for sale of that business entity.  It is misleading, at best, to cite receipt of 24.5% as sufficient to fully capitalize Bluestone.  What is missing here is use of the subpoena process to pursue the capitalization of Bluestone.</span>
-----
As to the Court's request that the Trustee take a position on the Motion to Reopen, I think that your client as creditor should have the right to have the case re-opened and given time for your client's own discovery. Your client provided sworn representation that he did not receive notice of the bankruptcy. It seems undisputed that the address was wrong, and that Debtor's counsel only partially corrected the error (which often result from debtor's counsel incorrectly inputting data). Even if, as Debtor contends, the incorrect suite number should be "good enough" to get the notice to your client, I don't see evidence that the Debtor's counsel ensured that the Notice of Bankruptcy was re-served on your client once the address was "corrected." I think it's likely that notice was never sent to the partially correct address. For this reason, I think your client should have an opportunity to do reasonable, targeted Rule 2004 Examinations of the Debtor regardless of what the Trustee decides to do.

Since Judge Brown wants the Trustee's perpective, I look forward to responses to my questions above. I recognize that any debtor could be lying to the trustee, and in this case, my client was not the trustee who evaluated these debtors' credibility... In this case, from my perspective so far, the debtors' stories seem consistent and plausible, and I don't see likely current assets or claims of the Estate that I think the Trustee would want to investigate and pursue. Therefore, before I talk to the Trustee about next steps, I look forward to your and your client's perspective on what I might be missing.

As pointed out above and what we've submitted, we have many objective reasons to question debtor's trustworthiness.  Relatively minimal investigation through issuance of subpoenas and review of business records can quickly reveal whether there are assets available for creditors in this case.  My client is a seasoned California attorney.  He's put a great deal of time and money into investigation and reopening this case so that a trustee can investigate.  He is not the type to throw good money after bad and would not have sought reopening if his investigation hadn't turned up so many inconsistencies.  He remains willing and able to assist but I think the trustee has to issue those subpoenas.  I don't believe the court will allow a creditor to make inquiries that relate to uncovering assets.

Thanks,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Wednesday, October 02, 2019 11:33 AM |
| **To:** | Natalie Scott |
| **Cc:** | Rachael Wolfgang |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |

Natalie -- A few comments...

I wish Amy was the original trustee; part of the challenge here is that she doesn't have any experience with the debtors, so we're coming into this cold.

I do think that creditors have as much power under Rule 2004 as trustees and that you can get authority to issue your own subpoenas.

I'm not opposed to seeking discovery on behalf of the Trustee. But I don't think a barrage of Rule 2004 orders/subpoenas is appropriate without our own evidence of wrongdoing. I appreciate your client believes the Debtors are hiding assets based on his personal experience, and I'm not disputing his contention. However, contrary to your client's strong feelings and frustration expressed in the comments below, I still don't have evidence for Amy to make a determination that Mr. Sanders has made any material misrepresentations -- including the existence of assets of the estate.

Your client seems confident that it would be possible to prove material misrepresentations by the Debtor with a few well-directed subpoenas. However, if the Debtors are truly as manipulative as your client contends, I'm concerned about how we identify/locate estate assets. If the Trustee requested four years of bank statements and tax returns, plus all post-petition bank statements and taxes, do you think that would be sufficient to elicit evidence of wrongdoing or misrepresentation?

I'll be out of my office much of today, but around tomorrow if you would prefer to talk by phone.

Thanks,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

**From:**        Natalie Scott
**Sent:**        Monday, October 14, 2019 11:34 AM
**To:**          'Justin D. Leonard'
**Subject:**     RE: In re Pearlstein, 17-32770-tmb7 follow-up

Justin,

Following up on our call  about a week and a half ago re: a joint documents request to debtors, was I supposed to be drafting something to send you to review or were you going to send that out ahead of next Tuesday's hearing?  Are you thinking a joint email request to the attorney or a formal 2004 document request (which would then be "of record" for Judge Brown to see?).  Happy to help however works.  Just let me know.

Thanks!
Natalie

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Monday, October 14, 2019 4:45 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |

Ball is in my court. Working on a plan with the Trustee. She has been crazy busy (in a ton of hearings recently) and I've been out myself quite a bit. So while we've exchanged emails, we've not had a chance to talk about these next steps... I will get back to you shortly.

Thanks,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Monday, October 21, 2019 4:11 PM |
| **To:** | Natalie Scott |
| **Subject:** | PEARLSTEIN - Update |

Natalie,

I wanted to let you know that the Trustee authorized a broad demand to Debtors for bank documents for all of their accounts from July 2013 through present. The Trustee may decide to request further tax returns also.

So far the Debtors and counsel have been very cooperative. They have worked hard last week and this weekend to gather all the statements prior to tomorrow's hearing. However, they had to request early statements from their bank, and the Trustee and I have not had a chance to review the statements that they have accessed online and produced.

Therefore, I plan to advise Judge Brown on Debtors' cooperation with our requests, and that we would like the hearing continued so that the Debtors can finish production and we have time to review them. The Trustee and I will review them ourselves. We will let you know if we have any questions or anything else that your client may be able to help with in our investigation.

Let me know if you have any questions.

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



[**Leonard Law Group LLC**](#) | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Tuesday, November 05, 2019 11:23 AM |
| **To:** | Justin D. Leonard |
| **Subject:** | RE: PEARLSTEIN - Update |

Hi Justin,

I've now had time to confer with my client, Bob Sanders, about the hearing on 10-22 and where things stand.  He plans to be on the line for the continued December hearing.

I don't know if you've received everything from the Debtors yet (or had a chance to review) and I understand you do not feel you can share it with us.  I don't know whether you can share general updates/impressions?

We are evaluating the option of using the 2004 process to obtain whatever records the trustee has received from debtors and/or to request records and/or examination of David Pearlstein.  We certainly don't want to inadvertently interfere with the trustee's investigation in any way so I thought I would check whether you have thoughts or concerns about that?

I would also like to once again offer to have you talk with my client directly.  Before you and the trustee make any final decisions on whether and how to further investigate, we'd like that opportunity, especially if the trustee if considering stopping investigation and/or declaring this a no-asset case.

We obviously have some time ahead of the 12-17 hearing.  It would help if you have any updates for us or can share your thoughts about my client and I possibly investigating without duplicating or inadvertently interfering with your and the trustee's efforts.

Thank you for your consideration.  (And, I hope you enjoyed Halloween last week - it sure was cold so I don't know whether you took your little guy out for any festivities but Brr!)

Regards,
Natalie

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Tuesday, November 05, 2019 12:46 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: PEARLSTEIN - Update |

Hi Natalie,

Thanks for checking in. As I mentioned at the hearing, the Trustee believes she has an independent duty to investigate whether assets exist or misrepresentations were made. While we appreciate your client's (and your firm's) offers to help with the investigation, we think it is better that our investigation remain independent at this time.

The Debtors have been fully cooperating with our requests to date, including providing bank and brokerage account statements from 2013 through present -- including business statements. They are extremely voluminous and it has taken some time to compile them. Many had to be requested by the Debtors in paper form from the bank, and they arrived by mail yesterday.

I would request that your client stand down from any simultaneous investigation -- at least for now. Please check back in a while -- say in the week of Nov. 25th -- and we can touch base then. The Trustee may or may not want to share what we've learned by then. Regardless, I should be able to at least tell you how we intend to handle the Court's questions about reopening at the next hearing.

Even though we may not be compensated for our efforts, the Trustee and we have a duty to diligently investigate, including regarding your client's concerns. Be assured we take that duty seriously.

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, December 05, 2019 3:07 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: FW: PEARLSTEIN - Update |

Hi Natalie,

The Trustee believes that the case should remain reopened for further investigation of potential assets, which we intend to do. I will report this to the Court. I may not say much more at this time. We'll see.

Although my trustee clients have sometimes allowed direct assistance in investigation/pursuit of assets by creditors (as you and I have discussed previously), in this case Judge Brown and my client both believe that my client has an obligation to independently investigate the situation on behalf of all creditors. Please be assured that we are actively doing so on her behalf.

To the extent we get further down the road and your client believes further investigation is warranted (*i.e.,* beyond what we do), I don't think we'll oppose that. But I do think it's better that we do our own first for now, since we are more impartial and the response will hopefully be less adversarial. Let's discuss this if your client feels strongly that he should investigate now/ASAP.

Thanks,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

---

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Thursday, April 16, 2020 1:27 PM |
| **To:** | Justin D. Leonard; Justin D. Leonard |
| **Subject:** | In re Pearlstein, 17-32770-tmb7 follow-up |

Hi Justin,

I hope this email finds you and your loved ones doing well amidst this COVID-19 mess.  I'm sure the impacts on the trustees' operations, as well as your firm, have been unprecedented.  We are hanging in there and trying to keep abreast of the near daily changes in law and policy affecting us and our clients!

I just realized emails from you were coming from 2 different addresses so I've listed both here.  If one is bad, let me know.

I'm just writing to inquire status of the Pearlstein case.  I saw you sent out production requests a couple months back, but then the world changed so I don't know if you guys got any responses or have anything that you can share with me to pass along to my client.  I told him I'd touch base in case you do have an update.

Thanks for any updates you can provide and Stay safe.
Regards,
Natalie



**Natalie C. Scott** | Attorney
PO Box 70422
Springfield, OR 97475
Phone: (541) 868-8005
Fax: (541) 868-8004
E-mail | Website

**\*PLEASE CONTACT US TO SCHEDULE IN-PERSON MEETINGS OR DOCUMENT DROP-OFF OR DELIVERY REQUIRING A PHYSICAL ADDRESS.\***
*This e-mail may contain privileged and/or confidential information.*
*Do not forward, copy or print without authorization.*
*If misdirected, please delete and notify the sender by e-mail.*

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, April 16, 2020 5:15 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |

Hi Natalie,

Good to hear from you. Doing OK, but it's been hard...

The document production has been slowed due to COVID-19, and the docs we received so far are mostly inconclusive as to the value of the policies at the time of filing -- but I'm hopeful that we'll get that soon. The key people at the insurance companies are no longer responsive (for obvious reasons).

I did a little research into 727(e) and whether there is any tolling for this type of situation -- to hold the debtors accountable for misstatements by revoking their discharge. Unfortunately, I don't see a way to do it... Let me know if you disagree or have any other great ideas. Criminal prosecution might occur but that doesn't help the creditors...

Hope you and your family are hanging in there!

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

---

**From:**          Natalie Scott
**Sent:**          Tuesday, May 12, 2020 4:37 PM
**To:**            Justin D. Leonard
**Subject:**       RE: In re Pearlstein, 17-32770-tmb7 follow-up

Insane that I've not gotten back to you Justin but it's still bolded in my inbox and I started some 727 research last week and hope to follow-up this week.

So, in your view then, is there no basis for a 548 claim (which could definitely be equitably tolled) with respect to any payments/transactions in getting the life insurance that he didn't report?

Hope you are hanging in there!
Natalie

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Wednesday, May 13, 2020 9:17 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |

I totally understand... Crazy times.

Regarding 548, I'm not sure how we would avoid the transfers since the debtors got value for the policies (for a year). (And the debtors didn't actually use their own money... so bizarre...)

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Tuesday, June 02, 2020 1:36 PM |
| **To:** | Justin D. Leonard |
| **Subject:** | RE: In re Pearlstein, 17-32770-tmb7 follow-up |

My apologies for my further delay in getting back to you, Justin. I hope you kept out of harm's way over these past few days. I hear the PDX federal courthouse was on the receiving end of some destruction. We watched fires blazing & storefronts being bashed in downtown Eugene "live" on Facebook Friday evening. Looked pretty bad up that way, too. Geez, times are even crazier …

Regarding this case, have you been able to get any more documents? I think the world was trying to return to normal so just wondered if you were able to uncover anything else.

I spent more time to confirm our initial hit that you can't equitably toll 727(e). I don't see a 9th Circuit case or much Circuit level at any time or recently. However, there are a lot of bankruptcy-level cases that decided that in the 1990s and I don't see any recent challenge to that analysis. *See, e.g., In re Reynolds*, 189 BR 199 (Bankr. D. Or 1995) (Judge Radcliffe). I guess everyone assumes there's no point in trying that particular argument and, because there were no changes to that language with BAPCPA, likely no good basis to try it again. I still see our judges citing to *Cisneros* and Judge Perris's decision in *In re Ford*, 159 B.R. 590 (1993). *Ford* rejected equitably tolling but then allowed creditor's debt to be excepted per 727 based on a due process argument --> Judge Perris found that the creditor didn't receive notice, that the omission of creditor by debtor was intentional, and that, had the creditor had notice, the creditor would have established a 727 based on omissions and false oath. I've discussed that option with my client before but don't see it as an available option to the trustee.

You're right that my client would really like to see recovery & distribution at the end of the day for all of his efforts. That said, the fraud should still be referred on for criminal conduct and perhaps there is a restitution element there that might assist my client.

Please let me know if you've gotten anything else and whether you were able to uncover anything regarding my clients suspicions of transfers to the kids in connection with the All-Care businesses. If you are able to find that, there is definitely equitable tolling on a 548 claim. Sounds like there may not be a factual basis under 548 as to the funds "transferred" into life insurance per your email below. That said, we suspect any such transfers into life insurance policies were done with intent to hinder, delay, or defraud so maybe there's a 548(a) actual fraud basis even if not a 548(b) constructive fraud basis? 548 requires transfer of "an interest of debtor" in property so if debtor directed someone else to pay for it for them and evidence is that it really was debtors' interest, maybe there's a case there?

If you can share any documents with us, that would be great. I feel like we discussed that before and you had concerns and I probably already offered an NDA/protective order type deal but if you have ideas on that, let me know. I'm not sure if my client would be interested but another option is whether the trustee would be interested in assigning the right to pursue the claims/investigation and so get documents to my client that way? I did a deal with Kim McGair in a Batlan case that Judge Brown approved (over a creditor objection). If I already offered that, too, forgive my COVID19 induced brain lapse but I wanted to mention it in case I hadn't.

Happy to discuss further at your convenience. And I will strive to be far more timely and responsive going forward on this.

Regards,

Natalie

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, June 04, 2020 8:24 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein, 17-32770-tmb7 follow-up |

Hi Natalie -- Thanks for your input. I am still waiting on some documents from one of the insurance companies, but at this point, things aren't looking great in terms of substantial recovery by the Estate. We see no evidence of transfers to the kids, and in fact one son had to loan them money and has preference exposure. I will talk to the Trustee about sharing what we have, but I think it would be best for us to document our findings for the Court itself.

Crazy times... I'm glad you are hanging in there. We are, but it's hard...

More soon,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho

**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
1 SW Columbia, Ste. 1010 | Portland, OR 97204
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**EXHIBIT B - Page 6 of 6**

## Natalie Scott

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, December 17, 2020 5:48 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: FW: In re Pearlstein, 17-32770-tmb7 follow-up |

Hi Natalie,

Good to hear from you. I did finally complete my report to the Trustee, and I expect you will see some action in the case early next year.

Crazy times, eh? We are surviving, but it's been a challenging year. Our son Mateo is 19 months old now, and the pandemic has made parenting extra challenging... I hope you guys are hanging in there too!

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**


On Wed, Dec 16, 2020 at 1:03 PM Natalie Scott <nscott@scott-law-group.com> wrote:

Hi Justin,


Hope you guys are doing well and staying healthy.  Just checking in to see if there's any further progress in this case that you can share with me?  Mr. Sanders was curious if there have been any developments.


Regards,

Natalie


**EXHIBIT C - Page 1 of 3**

**From:** Justin D. Leonard <jleonard@llg-llc.com>
**Sent:** Thursday, September 03, 2020 7:47 AM
**To:** Natalie Scott <nscott@scott-law-group.com>
**Subject:** Re: In re Pearlstein, 17-32770-tmb7 follow-up


Definitely yes!


- - -

**Justin D. Leonard**

Admitted in Oregon, Washington & Idaho

**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law

1 SW Columbia, Ste. 1010 | Portland, OR 97204

P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**


On Wed, Sep 2, 2020 at 2:59 PM Natalie Scott <nscott@scott-law-group.com> wrote:

Thanks Justin.  If there were a criminal case, would the estate (or creditors) possibly have a right to receive restitution?  I've never dealt with that before so just curious.


Natalie


**From:** Justin D. Leonard <jleonard@llg-llc.com>
**Sent:** Monday, August 31, 2020 3:21 PM
**To:** Natalie Scott <nscott@scott-law-group.com>
**Subject:** Re: In re Pearlstein, 17-32770-tmb7 follow-up


No change since my last report. I see little recovery for the Estate, but definitely substantial misrepresentations that may be criminally prosecuted. I'm working to document them now.


**EXHIBIT C - Page 2 of 3**

---

**Justin D. Leonard**

Admitted in Oregon, Washington & Idaho

**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law

1 SW Columbia, Ste. 1010 | Portland, OR 97204

P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

On Wed, Aug 26, 2020 at 2:02 PM Natalie Scott <nscott@scott-law-group.com> wrote:

Hi Justin,

My client dropped me a note to inquire on this case.  Any updates you can provide?

Thanks and hope you have been able to enjoy summer and get out a bit despite all the craziness up that way and nationally.

Regards,

Natalie

**EXHIBIT C - Page 3 of 3**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Wednesday, December 22, 2021 9:17 AM |
| **To:** | Natalie Scott |
| **Cc:** | Holly C. Hayman |
| **Subject:** | Re: FW: Sanders - Ntc of Telephone Hrng (122121) |

Hi Natalie,

Crazy it's been a year since I last reported to you... I don't have anything I'm authorized to share at this time. Sorry I can't be of more help at the moment. Either the Trustee or I will definitely report to the Court what we can at the hearing.

Hope you have a great holiday if I don't talk to you before!

Regards,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

On Tue, Dec 21, 2021 at 4:47 PM Natalie Scott <nscott@scott-law-group.com> wrote:

First, Happy Holidays to you guys!!!!

Next, looks like court set a January status hearing on case closing. I'm just wondering if either of you can share any info on this case (In re Pearlstein, 17-32770-thp7)? My recollection is I communicated quite a bit with Justin who ultimately subpoenaed documents and then was doing some investigation and follow-up that he wasn't able to share details on. Nothing has been filed in the bankruptcy court for a year or more. I assume the court is trying to clear things & looks like this is set with Judge Pearson.

As Justin may recall, my client (Robert Sanders, California attorney) was passionate about this matter and hoping to bring to light what he felt were misrepresentations by Pearstein so if there's any updates or information you can share, please let me know when you get a moment. I've forwarded this hearing notice to Mr. Sanders and encouraged him to call in for the hearing, too.

Hope this email finds you both doing well and looking forward to a wonderful upcoming holiday season.

Regards,

Natalie

**Natalie C. Scott** | Attorney
PO Box 70422
Springfield, OR 97475
Phone: (541) 868-8005
Fax: (541) 868-8004



**E-mail** | **Website**

**\*PLEASE CONTACT US TO SCHEDULE IN-PERSON MEETINGS OR DOCUMENT**

**DROP-OFF OR DELIVERY REQUIRING A PHYSICAL ADDRESS.\***

*This e-mail may contain privileged and/or confidential information.*
*Do not forward, copy or print without authorization.*
*If misdirected, please delete and notify the sender by e-mail.*

**Natalie Scott**

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Monday, February 07, 2022 4:50 PM |
| **To:** | Justin D. Leonard |
| **Subject:** | In re Pearlstein, 17-32770-tmb7 - Debtor's passing (3 months ago) |
| **Attachments:** | Pearlstean Eulogy by son David 12-27-21.docx |

**Importance:**     High

Justin,

I want to reiterate how much I appreciate Amy sharing information at the hearing in mid-January.  My client just learned that Mr. Pearlstein died on November 2, 2021.  Debtor's attorney, Jeff Olson, was at the hearing and mentioned not having heard from his client but not that his client had passed away over 2 months ago.  Perhaps the family didn't let Mr. Olson know.

In any event, we wanted to let the Trustee know this information.  If you already learned about this, do you know if a probate has been opened?  Where might this leave status re: the communication/offer Amy said you all sent to Mr. Olson ahead of the January 18 hearing?

Below is a redacted/excerpted email with links that I'm passing along from my client.  Attached in Word is a cut-paste of the eulogy in case the post is removed in the future.

Regards,
Natalie

In connection with the debtor, … have discovered announcement of his death on **November 2, 2021**. The announcement can be found at: https://www.legacy.com/us/obituaries/inquirer/name/irwin-pearlstein-obituary?id=31984072.

Background on judgment debtor can be found at the following:
http://sonnystories.com/?fbclid=IwAR2tlnQsZwplh5gGdlfN0vWR-O3xu5oRTkT8ebVzidtxhGWZjCN3duNitXU

[In the eulogy, son David] admits that he and judgment debtor were partners in the Oregon Care business. You can read the eulogy at https://sonnystories.com/?p=93.  …. judgment debtor was, as usual to avoid his creditors, the silent business partner with his son, [David]. The reward for judgment debtor was the payout to his wife in the form of "wages" from employment for which she had no experience of knowledge how to carry it out. It is on-going.

**\*\*\*\*\***
[The] surviving spouse is Chris Ramsower-Pearlstein.

## Natalie Scott

| | |
|---|---|
| **From:** | Natalie Scott |
| **Sent:** | Thursday, March 31, 2022 3:36 PM |
| **To:** | Justin D. Leonard |
| **Subject:** | In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122) |
| **Attachments:** | Ch 7 Motion to Settle and Compromise (032122).pdf |

Justin,

My client has some questions for the trustee regarding the attached. I would prefer to avoid filing an objection so am hopeful you or Amy can address these concerns.

1. Exactly what life insurance policies are being referred to in the Motion to Settle and Compromise; and, whether any of those policies insured the life of the deceased bankrupt. If the answer is "yes", what was/is the amount of insurance for each and has it yet been disbursed.
2. Exactly what life insurance products were purchased as "straw buyers" and for whose benefit were the purchases, and each of them, made? Again, we request disclosure of specific amounts of payment for each such product and benefits.
3. Exactly what happened to "Mrs. Pearlstein's" interest in Bluestone Surety? Please trace the investment and the funds distributed from the investment.
4. Exactly what are the terms of the "preferential repayment of" automobile loans from David Pearlstein and what reason was given by debtors and David Pearlstein, and each of them, for those preferential loans?
5. Has the Trustee sought criminal sanctions against the surviving debtor?

As you know, my client has been dealing with Mr. Pearlstein for many, many years and believed there would be substantially more recovery in this case than $54,000, of which we presume roughly $15K-$20K will go to trustee's commission, CPA & attorney's fees. We very much appreciate your and the trustee's efforts but my client feels the proposed settlement figure is low and so would like this additional information. Happy to coordinate a conference call with my client on the line if that might be more efficient.

Regards,
Natalie

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Monday, April 04, 2022 5:38 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122) |

Hi Natalie,

I understand your client's frustrations, and we appreciate his concerns. I normally wouldn't provide so much detail to a creditor, but in this case, we appreciate how he has been tracking this case carefully and sharing as much as possible with us (though unfortunately, many of the suggestions that were provided did not lead to either assets or fraud).

If there isn't a meaningful financial benefit from this case, at least we can provide some information so that your client understands more of the context for why we are confident that (1) this is an appropriate settlement, and (2) that we are not missing any assets that could possibly be recoverable.

Here are responses to your questions:

**1.  Exactly what life insurance policies are being referred to in the Motion to Settle and Compromise; and, whether any of those policies insured the life of the deceased bankrupt. If the answer is "yes", what was/is the amount of insurance for each and has it yet been disbursed.**

Three of the life insurance policies had been purchased by the Debtors for $133,970 within approximately 9 months of the bankruptcy filing in July 2017, as follows:

§ Allianz Life Ins. Co. - $1 million life insurance policy of Chris Ramsower-Pearlstein (Policy # 60090536) - $31,577 premium paid in November 2016;

§ Fidelity & Guaranty Life Ins. Co. - $1 million life insurance policy of Irwin Pearlstein (Policy #L0982800) - $70,460 premium paid in December 2016, plus $10,770 paid in January 2017; and

§ Accordia Life and Annuity Co. – $1 million life insurance policy of Chris Ramsower-Pearlstein (Policy #UL00020608) - $21,163 premium paid in January 2017.

Those three life insurance policies appear to have had no meaningful cash redemption value as of the time of the filing of the case. The policies each lapsed due to nonpayment of the second annual premiums due in late 2017 and early 2018.

Then in 2018 (after their bankruptcy case had closed), it appears that the Debtors purchased two separate life insurance policies from Cincinnati Life Insurance Co., and also two life insurance policies from American General Life Insurance, paying total premiums in 2018 of $204,418.

During all relevant periods (including as of the Petition Date), Ms. Ramsower-Pearlstein also owned a whole life policy through Penn Mutual Life Insurance Company issued February 22, 1967. Ms. Ramsower-Pearlstein's Penn Mutual policy has a death benefit of approximately $41,000 and a cash surrender value of approximately $28,000. This Penn

Mutual life insurance policy was encumbered long ago by a loan taken out by Ms. Ramsower-Pearlstein in approximately the same amount. Neither this Penn Mutual life insurance policy nor the loan owed by Ms. Ramsower-Pearlstein to Penn Mutual was disclosed in the bankruptcy case.

Unfortunately for the Estate, this insurance scheme was stopped (we believe independently of our own efforts to investigate). Therefore, no policies were in place to insure Mr. Pearlstein's death at the time he passed away.

**2. Exactly what life insurance products were purchased as "straw buyers" and for whose benefit were the purchases, and each of them, made? Again, we request disclosure of specific amounts of payment for each such product and benefits.**

The policies are described above. Based on our analysis of the Debtors' cash flow, including a detailed review of checks and deposits, and obtaining the documents from the relevant insurance companies, we found that the Debtors received some benefit from these transactions.

Notwithstanding the Debtors' sworn representations in (i) the Statement of Financial Affairs, including regarding disclosure of income and regarding transfers, and (ii) in response to the related questions asked by Mr. Arnot in the Meeting of Creditors, it appears that the Debtors maintained a separate side-business by serving as "straw buyers" of life insurance products – generally generating undisclosed net income of $5,000-$8,500/year. All aspects of these activities – whether truly legitimate or not – were concealed from the initial and successor chapter 7 trustee and the Bankruptcy Court.

Based on our investigation, we learned that the Debtors worked with California insurance broker Alexander Spero and his companies, including XSIS Ins. Marketing Inc. and First Matrix Insurance Marketing Incorporated. Both of the Debtors independently served as so-called "straw buyers" of over a dozen separate life insurance policies since at least 2013 through at least 2019 (which was the scope of the Trustee's investigation, but it may have started even sooner). In exchange for cash payments and essentially-continuous life insurance coverage, the Debtors made significant and fraudulent misrepresentations in life insurance policy applications and purchased policies that they did not intend to keep, using funds advanced by third-parties for this purpose.

It appears that the Debtors knowingly served as "straw buyers" in this ongoing scheme. In this role, the Debtors purchased long-term life insurance policies arranged by their broker. The broker or an affiliate would fund the exact amount of the premium payment, which the Debtors would deposit. The Debtors would then write a check to the life insurance company in the same amount, to fund the first annual premium payment. (No further premium payments would be made, so the policy would lapse after one year.) At some point after the initial premium was paid, the life insurance company paid a commission to the broker. The broker's commission was greater than the first-year's premium, creating net income for the broker. A portion of the commission was then paid by the broker to the Debtors in exchange for the Debtors' cooperation in the scheme.

This scheme came to light during the Trustee's investigation. The Debtors explained to us that the Debtor's broker (Alexander Spero) had "felt sorry for" the Debtors when he found out that they did not have, and could not afford, life insurance for themselves. Therefore, Mr. Spero offered to loan them funds to purchase life insurance through his company. Even if true, it appears that the Debtors knowingly profited from this ongoing insurance fraud scheme. It appears that the Debtors generally made over $5,000 of net income every year, for many years – besides having the benefit of between $1-3 million in life insurance coverage at any one time, based on misrepresentations made to the insurance companies.

**EXHIBIT F - Page 3 of 9**

In exchange for a share of the proceeds that the Debtors received from their broker, the Debtors each regularly (a) misrepresented their income and net worth; (b) asserted that they did not have other life insurance policies in place at the time of the application; (c) represented that they had not applied for life insurance from other companies in the last year; and (d) certified that they were paying the premium using their own funds – and not with funds provided by a third-party.

As of the time of filing of this bankruptcy case, at least three insurance policies had been recently purchased for $133,970. None were disclosed on the Schedules, which requires disclosure of all insurance policies. The Debtors did not disclose on their Statement of Financial Affairs the gross income that they received from Mr. Spero's insurance marketing companies (*e.g.,* $142,513.93 in the 12 months prior to the bankruptcy filing, which increased to $212,181.70 in 2018).

Furthermore, the Debtors did not even disclose the net income that the Debtors had received from the companies, after deducting the costs of the requisite insurance policies (e.g., net income of at least $8,543.93 in the 12 months prior to the bankruptcy filing).

Also, it does not appear that any of this taxable income was reported on the Debtors' tax returns.

We have had extensive communications with the California Insurance Division's fraud investors regarding the situation. I can't comment more in that regard.

**3. Exactly what happened to "Mrs. Pearlstein's" interest in Bluestone Surety? Please trace the investment and the funds distributed from the investment.**

When your client moved to reopen this case, he alleged that as Mr. Pearlstein's former attorney, he understood that the Debtors had invested significant funds into their children's businesses. As you know, in Mr. Pearlstein's sworn response to these allegations, Mr. Pearlstein described his son's business, Bluestone Surety, as being both established and developed by his son's efforts alone. Mr. Pearlstein represented that his son sold Bluestone for an "eight-figure amount" and that the proceeds were "shared with stakeholders of which my wife and I were not one." *See* Pearlstein Decl. dated Aug. 2, 2020 (Dkt. 25), at 3.

In fact, the Trustee's investigation identified significant lump-sum wire transfers into the Debtors' bank account from "Pearlstein Associates LLC": $31,508.89 in 2014, and then nearly $20,000 in both 2015 and 2016. When I asked the Debtors about Pearlstein Associates LLC initially, the Debtors explained that the entity was created to support a multi-level marketing business venture that the Debtors closed in 2009.

However, once confronted with the large wire transfers from Pearlstein Associates LLC, Mr. Pearlstein then represented to me and the Trustee that Ms. Pearlstein-Ramsower had loaned $100,000 to Mr. Pearlstein's son David for his business Bluestone Surety; that the loan was converted to ownership; and that when the business was sold in 2012, his son repaid the loan through Pearlstein Associates LLC.

Based on documents subsequently obtained by the Trustee, it appears that in March 2008, Ms. Pearlstein-Ramsower entered into a pledge and loan transaction with Bluestone and Pearlstein Associates LLC. The transaction provided Ms. Pearlstein-Ramsower with membership units in the LLC in exchange for her payment of $100,000.

As of the 2010 version of the Operating Agreement, Pearlstein Associates LLC was owned by Irwin's two sons David and Barry, along with Ms. Pearlstein-Ramsower and two other yet-unidentified members.

The LLC remained in business and transferred funds to the Debtors' bank account regularly through 2016, at which point the LLC dissolved.

The Trustee has confirmed that Bluestone Surety was wholly owned by Pearlstein Associates LLC, a South Carolina company, until Bluestone's sale in July of 2012 to American Safety Insurance Holdings, Ltd. It is unclear how much money the Debtors received in total from Ms. Pearlstein-Ramsower's interest in David Pearlstein's company. However, it is clear that on account of Ms. Pearlstein-Ramsower's interest in the company, the Debtors received residual funds all the way through 2016 – the year prior to the Petition Date – at which point Pearlstein Associates LLC was dissolved.

Here are the residual payments that were made since 2014:

      1/8/14 Pearlstein Associates LLC $31,508.89
      1/6/15 Pearlstein Associates LLC $18,593.08
      1/5/16 Pearlstein Associates LLC $18,593.08

This is a significant disclosure issue, but we have no evidence to suggest that any of these funds existed as of the Petition Date, or that any remaining entitlement existed. The funds received were consumed on day-to-day living expenses.

**4. Exactly what are the terms of the "preferential repayment of" automobile loans from David Pearlstein and what reason was given by debtors and David Pearlstein, and each of them, for those preferential loans?**

Notwithstanding the Debtors' sworn representations in (i) the Statement of Financial Affairs requiring disclosure of any payments made to family members and (ii) in response to the related questions asked by Mr. Arnot in the Meeting of Creditors, the Debtors made (and failed to disclose) $600 payments to their son David based on a car loan that he had made to them. Only four of these payments (totaling $2,398) fall within the 1-year preference period.

The Debtors explained that they purchased their car -- a 2013 Camry -- in 2014. The Debtors' needed David to help them by cosigning on the loan, which the Debtors worked on paying down. David decided he didn't want to be on the Debtors' car loan, so David decided to pay off the loan. The Debtors then paid David instead as they could.

Please understand that we have obtained voluminous records from financial institutions, and we have scrutinized the flow of funds through all of the debtors personal and business accounts and analyzed their spending habits. Unfortunately, despite evidence of serious misrepresentations to the Court, we see no evidence of assets of the Estate that could be pursued -- or avoidance actions, such as potentially fraudulent transfers.

**5. Has the Trustee sought criminal sanctions against the surviving debtor?**

A trustee has no authority to prosecute bankruptcy fraud, or any other crimes. The role is purely civil (v. criminal) -- to investigate potential assets and claims on behalf of the Estate and its creditors.

However, a trustee has an obligation to make criminal referrals to the appropriate authorities when the trustee deems it appropriate. Such referrals are confidential. In fact, we generally do not hear about

the investigations and determinations of those referrals unless action is taken and we are asked to testify in the criminal proceeding.

Generally the US Attorney would pursue such claims, and the FBI does the investigation, building off of the materials generated from the Trustee's investigation.

I hope those explanations are helpful.

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

## Natalie Scott

**From:** Natalie Scott
**Sent:** Wednesday, April 06, 2022 5:28 PM
**To:** Justin D. Leonard
**Subject:** RE: In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122)

Justin,

I'm scheduled to chat with my client later this week but I do have a proposal I wanted to run by you.  First, I have no idea what admin claims look like but have guesstimated my client would receive roughly $30K out of the settlement funds, can you provide trustee's estimated return to unsecured creditors under the proposed settlement?

Next, my client is interested in the 2018 insurers and any claims Debtors might have against them (or any other third parties).  Would the trustee be willing to assign those rights to my client?  He realizes it may be a dead end in light of the likely misreps on the applications by the debtors.  Current Settlement notice doesn't appear to include any claims/rights of Debtors against 3rd parties (and they didn't schedule any but, as we know, lots they didn't disclose/schedule).  I'm not sure if we'd need to require Debtors to amend schedules and do Settlement Notice but wanted to float the idea to you and truste first?  Let me know your thoughts.

Thanks much Justin.
Natalie

**From:** Justin D. Leonard <jleonard@llg-llc.com>
**Sent:** Tuesday, April 05, 2022 2:07 PM
**To:** Natalie Scott <nscott@scott-law-group.com>
**Subject:** Re: In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122)

Thanks. This case has been a huge amount of work, and I wish that we could have found meaningful assets. But I am confident that there aren't any (that the Bankruptcy Estate could somehow be entitled to).

Nevertheless, I hope that your client appreciates the effort we put into this, and the information that we did uncover (which supported his concerns).

Regards,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Thursday, April 07, 2022 8:58 AM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122) |

Hi Natalie,

As to your first question, I will need to talk to the Trustee about her projections, and to what extent we should reduce our $47,000 of fees and costs from the investigation under the unique circumstances of this case. Also, we will also need to figure out what the priority tax claims are at this point, to determine whether general unsecured creditors such as your client will receive any financial recovery from the settlement. Regardless of whether there is a financial recovery, I hope your client sees value in the information provided -- and the potential ramifications of the Trustee's findings regarding the Debtors' misrepresentations.

As to your second question, what claims do you think the Trustee/Estate holds?

In regards to the insurers themselves, no claims exist (or we would have pursued them). The special type of life insurance policies that were purchased using funds of the broker (and which generate a high commission for the broker, significantly greater than the amount of the initial premium) lapse after one year if the policyholders don't continue paying the annual premiums. The Debtors had no funds to do so. However, the broker would fund their purchase of new policies (until our investigation, and the broker's health issues, shut down the fraud).

As to the broker and his defunct companies, I think recovery is unlikely. Also, as I mentioned, the premiums were funded by the broker, and the Debtors were actually compensated for their efforts. Therefore, they received a net benefit from this scheme. Plus they have seriously unclean hands based on their significant misrepresentations made to the insurers. Therefore, I see no chance of recovery. Are there potential claims that I'm missing that your client might be interested in?

I hope that is helpful.

Regards,

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**


On Wed, Apr 6, 2022 at 5:28 PM Natalie Scott <nscott@scott-law-group.com> wrote:

**Natalie Scott**

| | |
|---|---|
| **From:** | Justin D. Leonard <jleonard@llg-llc.com> |
| **Sent:** | Monday, April 11, 2022 2:11 PM |
| **To:** | Natalie Scott |
| **Subject:** | Re: In re Pearlstein - Ch 7 Motion to Settle and Compromise (032122) |

Natalie,

I relayed and discussed your comments with the Trustee. She is not sure what Mr. Sanders and you were expecting in terms of recovery. As she points out, of course he can object and effort to show that further pursuit would lead to additional funds/assets. We are not aware of any.

Because the IRS claim has been fully paid / resolved by the Debtors and has been amended to $0 on the Court's register, the Trustee projects a distribution to Mr. Sanders of about $22,000 assuming no further claims are filed before tomorrow's deadline. That seems meaningful under the circumstances.

As for the request to see all documents obtained in this case, the Trustee is not aware of a circumstance where it would be appropriate for her to provide those to a creditor absent a Court order. (Nor am I -- which is why I haven't...)

With respect to your comments about attorney fees and requirements to amend or otherwise change the employment application, the $15k competitive bid requirement applies at the outset and to the estimated fees. The Trustee can't imagine a situation where a case gets going, fees crest $15k and then a trustee seeks alternative representation based on price.

I think that responds to all of your questions. Despite our efforts, we recognize the information and answers in this email chain may not satisfy you or your client. At least you have been fully apprised of the full extent of our investigation -- as well as being provided an estimate of the expected distribution that should result from the settlement.

Justin


- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho



**Leonard Law Group LLC** | Commercial Bankruptcy & Business Law
4110 SE Hawthorne Blvd. PMB #506 | Portland, OR 97214-5246
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**


**EXHIBIT F - Page 9 of 9**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2022, the foregoing **CREDITOR ROBERT SANDERS' OBJECTION TO TRUSTEE'S MOTION & NOTICE OF INTENT TO SETTLE & COMPROMISE (DOC. NO. 51)** was served on the following:

☒ **Via First Class Mail to:**

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

☐ Via Facsimile to: N/A

☒ **Via ECF Notification to:**

| | |
|---|---|
| JUSTIN D LEONARD | jleonard@LLG-LLC.com, justin-leonard-leonard-law-group-llc-5265@ecf.pacerpro.com |
| Amy E Mitchell | mitchelltrustee@comcast.net, OR21@ecfcbis.com |
| JEFFREY LEE OLSON | olson.jeff@mac.com |
| NATALIE C SCOTT | ecf@scott-law-group.com |
| US Trustee, Portland | USTPRegion18.PL.ECF@usdoj.gov |

☐ **Via E-mail to:**

DATED:  April 13, 2022


/s/ Natalie C. Scott
Natalie C. Scott, OSB# 024510


**CERTIFICATE OF SERVICE**                    Page 1 of 1



PO Box 70422
Springfield, OR 97475
Phone: 541-868-8005
Fax: 541-868-8004
www.scott-law-group.com